## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| **BYRON KEITH TATUM, II** | § | |
| | § | |
| **v.** | § | **NO. 4:23-CV-00658-BD** |
| | § | |
| **FRANK BISIGNANO** | § | |
| *Commissioner, Social Security* | § | |
| *Administration* | § | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Byron Keith Tatum, II, seeks judicial review under 42 U.S.C. § 405(g) of a final decision of the United States Social Security Administration Commissioner denying his claim for disability insurance benefits. Having reviewed the transcript of the administrative hearing, the parties' briefs to this court, and the evidence in the administrative record, the court will affirm the Commissioner's decision.

## BACKGROUND

A "younger person" at the time of his application, *see* 20 C.F.R. § 404.1563(c), Tatum applied for benefits based on multiple ailments. AR 99, 342–343, 370. The Commissioner denied his application initially and on reconsideration.

At a subsequent hearing before an administrative law judge ("ALJ"), Tatum testified that he had some college education and previously worked in customer service and tech support. AR 35, 44. But then his vision deteriorated and, because of that, his productivity suffered. AR 44. Tatum testified that he had "nystagmus since birth" that caused him "to have low vision." AR 38; *see Nystagmus*, Dorland's Illustrated Medical Dictionary, pp. 1307–08 (32nd ed.) (defining nystagmus as "an involuntary, rapid, rhythmic movement of the eyeball"). Despite surgery and various medications, he continued to experience visual pain and impairment. AR 38–39. As a result of his alleged disabilities, Tatum reported problems completing household chores, driving, grooming

himself, and sleeping. *Id.* When questioned about his ability to reenter the workforce, he stated: "If I didn't have the vision issue, I would be able to work." AR 42.

After the hearing, the ALJ concluded that Tatum was not disabled within the meaning of the Social Security Act and was therefore not entitled to benefits. His decision, AR 140–149, found that Tatum met several requirements, including establishing the severe impairments of "carpal tunnel syndrome, [nystagmus] and osteoarthritis of [the] thoracic spine," AR 142. But it went on to find that Tatum: (1) did "not have an impairment or combination of impairments that me[t] or medically equal[ed] the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1"; (2) "ha[d] the residual functional capacity ["RFC"] to perform light work as defined in 20 CFR 404.1567(b)" with certain exertional and visual limitations; and (3) could perform "jobs that exist[ed] in significant numbers in the national economy." AR 143, 148; *see* 20 C.F.R. § 404.1545(a) (defining RFC and explaining its assessment and use); *id.* §§ 404.1545(a)(3), 404.1546(c) (reflecting that an ALJ is responsible for determining a claimant's RFC at a disability hearing based on all of the relevant medical and other evidence); Social Security Ruling ("SSR") 96-8p (providing policy guidance regarding assessment of RFC).

Tatum asked the Administration's appeals council to review the ALJ's decision. It did so and vacated the ALJ's decision, remanding the case for further administrative proceedings. AR 153–58. The appeals council based its conclusion on the ALJ's failure to consider late-provided medical evidence and failure to adequately evaluate Tatum's mental impairments. AR 154–55.

On remand, Tatum testified that his vision fluctuates throughout the day and that he struggles with frequent tripping, depth perception, and eye strain when looking at computers. AR 56. He also testified that, due to his poor vision, his family had been assisting him with cooking, shaving, and differentiating between bottles in the shower. AR 64–65. After the hearing, the ALJ again concluded that Tatum suffered from severe impairments but did not qualify for benefits. AR 162–74.

But the appeals council vacated the ALJ's decision again. AR 179–84. This time, it faulted the ALJ for conducting an inadequate functional capacity assessment. AR 180. Specifically, it

concluded that "the visual limitations assessed in the residual functional capacity [we]re internally inconsistent and impermissibly vague." AR 181. For that reason, "[r]emand [wa]s required for further consideration of [Tatum's] visual limitations in vocationally relevant terms based on the evidence as a whole." *Id.*

On the second remand, Tatum appeared at a third hearing before a different ALJ, Susanne M. Cichanowicz. AR 74. The third hearing centered around Tatum's alleged visual and mental impairments. Tatum's attorney noted that Tatum "appears to range above and below the levels of listing in terms of visual acuity." AR 77. He stated that, as of June 2022, Tatum's "visual acuity in his worse eye after correction was 20/200 and in his best eye was 20/100" and it appeared that "there [had] been some visual field issues." *Id.* He added that Tatum is "limited in a way that isn't necessarily reflected by . . . ophthalmology testing" because his "eyesight is variable throughout the day" and he suffers "considerable eye strain." *Id.*

Although Tatum could still see, he had to "blow everything [up] . . . a significant amount" and "limit[] . . . the amount of time that he can look at [a] screen." *Id.* He testified that his visual challenges were "constant every day" but that the specific form of struggle changed daily. AR 83. Tatum noted the unpredictability of his condition; he testified that a room's lighting or his changing mood could impact his vision. AR 84. He recalled trying various medications without success and considered additional surgery. AR 84–85.

The ALJ asked Tatum about his cell phone and how he had adapted it to his lifestyle. AR 85. Tatum testified that his family set up audio-based shortcuts, that he used the reader function, and that he utilized screen enlargement. *Id.*

Tatum testified that, since leaving employment, he has spent a lot of his time home-schooling his children. AR 86. He also watches television "every now and then" with the assistance of a magnifying device. AR 86–87. He is "usually able to get through an entire 30-minute show" if he uses the device. AR 87. As of the third hearing, Tatum was learning Braille. *Id.* His attorney also noted other ailments related to Tatum's hands, knees, back, and neck. AR 77, 80.

3

Vocational expert Guillermo Pena also testified at Tatum's third hearing. AR 89. He classified Tatum's past work as a customer complaint clerk. *Id.* The ALJ then asked Pena whether a hypothetical person could perform that work if he could:

> lift, carry, push or pull up to 50 pounds, occasionally, and 25, frequently. Stand or walk for six hours out of an eight-hour day and sit for six hours out of an eight-hour day, occasionally climb ramps or stairs, never climb ladders, ropes or scaffolds, occasionally balance as it's defined by the DOT, frequently stoop, kneel, crouch and crawl. This individual must avoid hazards such as unprotected heights and fast-moving mechanical parts. The person can perform jobs that do not require operation of a motor vehicle or heavy equipment. The individual is able to perform jobs that require manipulation or handling of objects that are baseball sized or larger and the individual must avoid work tasks that require precise near visual acuity such as needle threading. The individual can perform jobs that require reading 14 point type or larger and is limited to no more than two hours of reading such written material during an eight-hour workday. And finally, the individual is able to understand, remember and carry out detailed, but not complex, instructions.

AR 90.

Pena testified that such a person could not perform Tatum's past work but could work as a day worker, laundry laborer, or cleaner. AR 90–91. When the hypothetical person's exertional range was limited to light, Pena testified that such a person could work as a garment sorter, cafeteria attendant, or office helper. AR 91–93. When that hypothetical person was limited to frequent, but not constant, handling and fingering, Pena testified that the availability of the jobs provided would not be affected. AR 93.

Tatum's attorney asked Pena if a hypothetical person, "at any exertional level[,] needed to take rest breaks above and beyond those customarily allowed in the morning, afternoon and lunch, what effect would that have on sustained employability?" *Id.* Pena responded, based on his professional observations and experience, that such a need would "disqualify the hypothetical individual from . . .employment." AR 93–94.

At the conclusion of the hearing, Tatum's attorney requested the opportunity to present an updated ophthalmologist report to assist the ALJ in her decision-making. AR 94. The ALJ granted that request "because [she] saw some discrepancies between the questionnaire that was filled out

and the examination that was done" and was "not satisfied by [Exhibit] 20F [AR 843–45]," Dr. Robert Hogan's visual RFC questionnaire. AR 94–95. The ALJ stated that her preference "would be to do a consultative examination by an ophthalmologist but then also have a medical expert opinion as to the equals listing" because Tatum's visual impairment was "a little bit unusual in terms of the presentation and the condition." *Id.* She also noted that "an ophthalmology [consultative examination] [was] done . . . in 2012" but "[n]othing ha[d] been [done] since then." AR 95.

After receiving the September 2022 ophthalmologist report, which was prepared by Dr. Stephanie Fleming, AR 946–50, and believing that his visual acuity met medical listing 2.02 based on that report, Tatum requested a change to his alleged disability-onset date from May 5, 2017, to September 8, 2022, the date Dr. Fleming examined him, AR 510–12, 947; *see* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 2.02 (listing 2.02, which reads: "Loss of central visual acuity. Remaining vision in the better eye after best correction is 20/200 or less"). He also "waive[d] his right to a supplemental hearing." AR 512.

The ALJ again denied Tatum's request for disability benefits. AR 11–13. The decision, AR 14–25, found that Tatum had "not been under a disability within the meaning of the Social Security Act from May 5, 2017, through the date of th[e] decision." AR 15. The ALJ noted that Tatum met several requirements, including establishing the severe impairment of congenital nystagmus. AR 16. But the ALJ found that Tatum did not meet listing 2.02 "because his remaining vision in the better eye is greater than 20/200." AR 17 (citing AR 818–42 (exhibits 18F and 19F), Tatum's UT Southwestern Medical Center records from December 3, 2019, and August 18, 2021); *see also* AR 22 (finding the state agency's determination, AR 118–35, persuasive). The ALJ stated that, although Dr. Fleming's examination "shows listing level visual acuity, this report is not consistent with the other evidence in [the] record showing visual acuity greater than 20/200 in the better eye." *Id.* The ALJ also stated that Dr. Fleming's report had "low reliability indicators." *Id.* A few pages later, the ALJ's report explained:

> [T]he undersigned is not persuaded by the opinion of consultative examiner, Stephanie Fleming, O.D., as her opinion is not supported by the evidence of record. Dr. Fleming did not address the low reliability and high false negative error on VF [visual-field] testing. She also stated that refraction significant [sic] improved vision yet noted the same visual acuity as 20/200. She also did not diagnose or assess the claimant's nystagmus, which is the condition alleged present since birth. She further reports optic nerve atrophy, which has never been diagnosed previously and is not explained in her report (Exhibit 24F [AR 946–50]).

AR 23.

The ALJ ultimately determined that Tatum could perform medium work. AR 19. The decision states that Tatum's impairments "could reasonably be expected to cause the alleged symptoms; however, [Tatum's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." AR 20. The ALJ noted that, "[w]hile [Tatum] has severe visual, musculoskeletal, and mental impairments, the record evidence fails to support his alleged loss of functioning." *Id.*

In December 2022, a notice of unfavorable decision bearing ALJ Cichanowicz's name was mailed to Tatum. AR 11–13. The ALJ's decision issued the same day and was signed by "Ralph F. Shilling on behalf of Susanne M. Cichanowicz." AR 25.

This time, the appeals council denied review of the ALJ's decision. AR 1–6. Tatum timely sought judicial review in this court. Dkt. 1; *see* 42 U.S.C. § 405(g).

## RELEVANT LAW AND STANDARD OF REVIEW

The Social Security Act governs, among other things, disability insurance and supplemental security income benefits. *See* 42 U.S.C. §§ 423, 1381. To be entitled to either, a claimant must have a "disability," a term principally defined in this context as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord id.* § 1382c(a)(3)(A).

At a hearing before an ALJ, a claimant generally bears "the burden of proving she has a medically determinable physical or mental impairment lasting at least twelve months that prevents

her from engaging in substantial gainful activity." *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000). The ALJ must determine whether: "(1) the claimant is not working in substantial gainful activity; (2) the claimant has a severe impairment; (3) the claimant's impairment meets or equals a listed impairment in Appendix 1 of the Regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the impairment prevents the claimant from doing any other work." *Id.* at 453 (citing 20 C.F.R. § 404.1520). The burden shifts to the Commissioner only at the fifth step of that analysis. *See id.* But if the Commissioner "fulfills his burden of pointing out potential alternative employment, the burden then shifts back to the claimant to prove that he is unable to perform the alternate work." *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990) (quotation marks omitted).

Under § 405(g), a court's review of an ALJ's decision is "highly deferential." *Perez v. Barnhart*, 415 F.3d 457, 464 (5th Cir. 2005). The court's role is limited to "ascertain[ing] whether (1) the final decision is supported by substantial evidence and (2) . . . the Commissioner used the proper legal standards to evaluate the evidence." *Newton*, 209 F.3d at 452. "Substantial evidence" is more than a scintilla but less than a preponderance. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). "A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision." *Id.* And although a court "must carefully scrutinize the record to determine if, in fact, [substantial] evidence is present," *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988), it "may not re-weigh the evidence or substitute [its] judgment for that of the Commissioner," *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000).

It is the ALJ's job, not the court's, to resolve any evidentiary conflict. *Carry v. Heckler*, 750 F.2d 479, 482 (5th Cir. 1985). For that reason, "a reviewing court must affirm the Commissioner, even when the court disagrees with the Commissioner's decision, so long as it is supported by some evidence that any reasonable fact finder might accept." *Washington v. Barnhart*, 413 F. Supp. 2d 784, 791 (E.D. Tex. 2006); *see Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000). An ALJ's failure to follow an applicable legal standard, however, requires remand when the error is harmful. *See Newton*, 209 F.3d at 452; *Lacher v. Comm'r, SSA*, No. 4:23-CV-00551-ALM-AGD, 2024 WL

7

4206749, at *6 (E.D. Tex. Aug. 26, 2024), *report and recommendation adopted,* 2024 WL 4205585 (E.D. Tex. Sept. 16, 2024).

### THE PARTIES' ARGUMENTS

Tatum asserts two points of error. He first argues that the challenged decision is not supported by substantial evidence because the ALJ "impermissibly rejected uncontroverted evidence"—Dr. Fleming's report—"that Tatum met Listing 2.02," Dkt. 17 at 10, as of his revised alleged onset date, *id.* at 1, 20. Although he acknowledges that it is rare for a claimant to meet a listing, he argues that he satisfies listing 2.02's criterion that his "[r]emaining vision in the better eye after best correction is 20/200 or less." *Id.* at 11; *see* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 2.02. He notes that, even though "[his] prior visual acuity scores did not meet the listing," his most recent ophthalmologist examination by Dr. Fleming does. Dkt. 17 at 11. He argues that the "older acuity readings the ALJ cited are irrelevant because Dr. Fleming indicated [that he] suffered from a progressive, deteriorating visual impairment." *Id.* He contends that it makes sense that his older records would conflict with his most recent exam and that it was illogical for the ALJ to reject Dr. Fleming's exam on that basis. *See id.* at 12.

Relatedly, Tatum argues that the ALJ improperly rejected Dr. Fleming's central visual acuity findings by referring to visual-field ("VF") testing. *Id.* He contends that by citing "low reliability indicators" and "high false negative error on VF testing," the ALJ was assessing his visual impairments under listings 2.03 and 2.04, instead of 2.02. *Id.* at 12–13. In Tatum's view, "[w]hatever flaws the ALJ perceived in visual field testing are therefore irrelevant." *Id.* at 13. As such, he claims that "the ALJ cannot reject uncontroverted medical evidence" and that, because "Dr. Fleming's opinion is uncontested, . . . an award of benefits is inevitable." *Id.* at 14.

In support of his second point of alleged error, Tatum argues that, at a minimum, the court must "remand for a new hearing because the ALJ who denied benefits neither heard Tatum's testimony nor followed [the Commissioner's Hearings, Appeals, and Litigation Law Manual ("HALLEX")] § I-2-1-55." *Id.* at 15; *see* Soc. Sec. Admin., HA 01210.055, Assignment of Service

8

Area Cases to Administrative Law Judges (2019), https://secure.ssa.gov/apps10/poms.nsf/lnx/
2501210055 (renumbering and amending HALLEX § I-2-1-55 and incorporating information
previously found in HALLEX § I-2-8-40). He asserts that, between his third hearing and the
subsequent decision, his case was reassigned to a different ALJ. *Id.* at 15; *see id.* at 15–16 (stating
that the ALJ who signed his disability decision, Ralph Shilling, replaced the ALJ who heard his
testimony, Susanne Cichanowicz). Tatum argues that HA 01210.055 required ALJ Shilling, as the
reassigned ALJ, to "investigate the need for a new hearing, [but] no such analysis took place." *Id.*
at 15.

In response to the first point, the Commissioner argues that the ALJ's review of the record was
sufficient under the applicable law. He asserts that the ALJ did not err at step three because "the
ALJ questioned the validity of [Dr. Fleming's] more recent 2022 visual acuity testing" and found
her report unpersuasive. Dkt. 18 at 1, 4. He adds that "evaluation of the accuracy of the ALJ's
analysis of the medical evidence is beyond the scope of judicial review." *Id.* at 5.

As to Tatum's second issue, the Commissioner asserts that Tatum "has not shown that ALJ
Shilling was actually reassigned the case by the agency." *Id.* at 5. He argues that "it appears [ALJ
Shilling] was merely signing the decision ALJ Cichanowicz heard and drafted but was unable to
sign." *Id.* He explains that HA 01280.040 provides that,

> [w]hen an ALJ who conducted a hearing is not available to issue a decision, the case
> is reassigned to another ALJ to review the record and write a decision. However,
> when an ALJ who conducted a hearing has approved a final decision draft but is
> unavailable to sign the final decision, the Hearing Office Chief Administrative Law
> Judge (HOCALJ) has authority to sign the final decision on behalf of the ALJ when
> the ALJ gives the HOCALJ written authorization.

*Id*; *see* Soc. Sec. Admin., HA 01280.040, Administrative Law Judge Conducts Hearing but Is
Unavailable to Issue Decision (2019), https://secure.ssa.gov/apps10/poms.nsf/lnx/2501280040
(renumbered from HALLEX § I-2-8-40). The Commissioner contends that Shilling was the
HOCALJ and that "this was very likely a matter where the HOCALJ merely signed the unavailable
ALJ's completed and final unfavorable draft decision." *Id.* at 6. In support, he notes that

9

"HOCALJ Shilling signed the hearing decision 'on behalf of' ALJ Cichanowicz rather than solely under his own name, which would have been the case had ALJ Shilling been reassigned the case." *Id.* He points out that "[ALJ Shilling's] signature alone does not mean that the case was actually reassigned to [him.]" *Id.*

Alternatively, the Commissioner argues that, even if the case was reassigned, Tatum "has not shown that the ALJ was required to state, on the record in the decision, his rationale as to whether a new hearing was necessary under HALLEX § I-2-1-55(F)(2) [HA 01210.055]." *Id.* at 7. According to the Commissioner, "there is no harmful error for failing to articulate on the record in the decision why a new hearing should not be held." *Id.* at 8. In his view, because the "ALJ did not largely rely upon th[e] fact that [Tatum] lacked credibility with regard to his symptoms or the limiting effect of his pain," the ALJ "did not err by failing to hold a new hearing after the original ALJ became unavailable." *Id.* He emphasizes that holding a hearing is discretionary. *Id.*

Finally, the Commissioner contends that Tatum "is unable to demonstrate prejudice from the alleged violations of HALLEX" because "he waived his right to a supplemental hearing in a November 8, 2022[,] correspondence." *Id.* at 9. The Commissioner suggests that Tatum "cannot claim prejudice . . . because he was unaware the case was 'reassigned' to HOCALJ Shilling when he waived his right to a supplemental hearing." *Id.* (citing AR 512).

In reply, Tatum faults the Commissioner for "rel[ying] exclusively on evidence that pre-dates [Dr. Fleming's] September 8, 2022 examination" and for failing either to "offer evidence that the ALJ complied with HALLEX" or to "dispute that Tatum's account of disabling vision loss was precisely the kind of testimony that was uniquely unsuited to a cold reading of the record." Dkt. 19 at 1. Tatum asserts that the Commissioner relies on old records that addressed a different listing's requirements. *See id.* at 2. He points out that the Commissioner claimed that Dr. Hogan's opinion supported rejecting Dr. Fleming's examination but that the ALJ found Dr. Hogan's opinion unpersuasive. *Id.* He also claims that the Commissioner conceded that "visual field results are distinct from, and irrelevant to, visual acuity and Listing 2.02," by not addressing his argument. *Id.* at 3.

Tatum also argues in reply that the Commissioner has the burden to establish which ALJ drafted the decision. *See id.* at 5. He asserts that, if the Commissioner is correct that ALJ Shilling just signed ALJ Cichanowicz's decision, ALJ Shilling did not comply with HA 01280.040 because the record does not contain a written authorization from ALJ Cichanowicz. *Id.* Further, he argues that it is immaterial how ALJ Shilling documented "compli[ance] with HALLEX to investigate the need for a supplemental hearing" because the "Commissioner fails to identify anything—either in the transcript or elsewhere—to suggest that inquiry took place." *Id.* at 6. Finally, as to the Commissioner's waiver argument, Tatum contends that, absent a "full understanding" that his case was reassigned, his waiver of a supplemental hearing was ineffective. *Id.* at 6–7.

## ANALYSIS

### I. Listing 2.02

The "Listings" describe "each of the major body systems impairments that [the Social Security Administration] consider[s] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 404.1525(a). "The criteria in the medical listings are demanding and stringent." *Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994) (quotation marks omitted). Listing 2.02 requires a "[l]oss of central visual acuity" to such a degree that "[r]emaining vision in the better eye after best correction is 20/200 or less." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 2.02. The listings are relevant at step three of the five-step evaluation process, *see Newton*, 209 F.3d at 453, so the claimant bears "the burden of establishing that his impairment meets or equals the criteria for presumptive disability described in the listings." *Whitehead v. Colvin*, 820 F.3d 776, 780–81 (5th Cir. 2016); *see* 20 C.F.R. § 404.1525(c)(3).

Tatum's argument that he meets listing 2.02 depends entirely on Dr. Fleming's report. *See* Dkt. 17 at 11 (explaining the basis for Tatum's decision to "amend his alleged onset date to the date of Dr. Fleming's examination"). That is to say, Tatum does not identify any other evidence that could support his assertion that he meets listing 2.02.

Tatum first argues that the ALJ's decision as to listing 2.02 is not supported by substantial evidence because the ALJ rejected Dr. Fleming's report based on "low reliability indicators," "outdated test results," and "unrelated concerns over Tatum's visual field." *Id.* 17 at 6. He does not, however, acknowledge the ALJ's other reasons for finding Dr. Fleming's opinion unpersuasive.

ALJs "enjoy discretion to find all or part of some opinions persuasive and all or part of other opinions unpersuasive, . . . so long as they do not make this determination 'arbitrarily.'" *Grennan v. Comm'r of Soc. Sec.*, No. 4:21-cv-00645-O-BP, 2022 WL 2056277, at *4 (N.D. Tex. May 23, 2022) (citing *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995), and *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987), and quoting *Strickland v. Harris*, 615 F.2d 1103, 1110 (5th Cir. 1980)), *report and recommendation adopted,* 2022 WL 2053168 (N.D. Tex. June 7, 2022). For that reason, a court conducting judicial review "will not second-guess the ALJ's choices so long as the ALJ explains herself sufficiently and substantial evidence supports the conclusion reached." *Id.* (citing 20 C.F.R. § 404.1520c).

Under the applicable regulations, an ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." 20 C.F.R. § 404.1520c(a); *see Webster v. Kijakazi*, 19 F.4th 715, 718–19 (5th Cir. 2021) (comparing § 404.1520c with its predecessor and citing a Social Security Administration final rule for its explanation that the current regulations allow "courts to focus on the content of the evidence rather than on the source" (cleaned up)). The regulations instead require the ALJ to "articulate . . . how persuasive [he or she] find[s] all of the medical opinions and all of the prior administrative medical findings in [a claimant's] case record." 20 C.F.R. § 404.1520c(b). In conducting that persuasiveness analysis, the ALJ must consider five factors: (1) supportability; (2) consistency; (3) the provider's relationship with the claimant; (4) specialization; and (5) other factors that tend to support or contradict the provider's opinion. *Id.* § 404.1520c(c).

The first two are "the most important factors"; the regulations state that the ALJ "will explain" how he or she considered them. *Id.* § 404.1520c(b)(2). The ALJ need not explain how he or she considered the three remaining factors. *Id.*; *Hepburn v. O'Malley*, No. 6:24-CV-540-SJH, 2024 WL 4647948, at *5 (M.D. Fla. Nov. 1, 2024). And even as to the supportability and consistency factors, "ALJs need not exhaustively explain their reasoning." *Lacher*, 2024 WL 4206749, at *7 (cleaned up); *see* 20 C.F.R. § 404.1520c(c). An ALJ need only cite "specific evidence in the record supporting his supportability and consistency determination." *Erlandsen v. O'Malley*, No. 4:23-cv-83-ALM-KPJ, 2024 WL 898915, at *4 (E.D. Tex. Feb. 14, 2024) (cleaned up), *report and recommendation adopted*, 2024 WL 897598 (E.D. Tex. Mar. 1, 2024).

As noted, in finding Dr. Fleming's opinion unpersuasive, the ALJ stated that the opinion

> is not supported by the evidence of record. Dr. Fleming did not address the low reliability and high false negative error on VF testing. She also stated that refraction significant [sic] improved vision yet noted the same visual acuity as 20/200. She also did not diagnose or assess the claimant's nystagmus, which is the condition alleged present since birth. She further reports optic nerve atrophy, which has never been diagnosed previously and is not explained in her report (Exhibit 24F [AR 946–50]).

AR 23.

The ALJ therefore rejected Dr. Fleming's opinion that Tatum's "best corrected visual acuity is 20/200 in the right eye and 20/200 in the left eye." AR 947. As Tatum accurately notes—and indeed emphasizes, Dkt. 17 at 12–13, 20; Dkt. 19 at 3–4—the only attachments to Dr. Fleming's report, AR 949–50, go to visual-field testing, rather than the visual-acuity testing that is relevant to listing 2.02. So it could not have been incorrect, especially under the forgiving standard of review, *see Perez*, 415 F.3d at 464, for the ALJ to conclude that the visual-acuity part of Dr. Fleming's opinion was "not supported by the evidence of record," AR 23. And again, the ALJ also noted Dr. Fleming's failure to assess Tatum's severe impairment of nystagmus and her provision of a different diagnosis—of atrophy, a degenerative condition, *see* Dkt. 17 at 11—without explanation. AR 23; *see* AR 948.

13

With Dr. Fleming's opinion permissibly pushed aside, the ALJ was left with Tatum's prior medical records. And as the ALJ noted, those records indicate that Tatum does not meet listing 2.02. AR 818–42 (cited in the ALJ's report as "Exhibits 18F; 19F," AR 17); *see* AR 824, 836; *see also* AR 20–23 (pages of the ALJ's decision citing AR 619–20, 688–746, additional records reflecting that Tatum did not meet listing 2.02).

Tatum argues that "the older acuity readings the ALJ cited are irrelevant because Dr. Fleming indicated Tatum suffered from [the] progressive, deteriorating visual impairment" of atrophy. Dkt. 17 at 11. But once again, that argument rests entirely on Dr. Fleming's report, which the ALJ permissibly rejected. *Id.* at 10–14. And to the extent Tatum relies on cases addressing when a court should remand for consideration of new evidence, *see id.* at 12, he does not advance his position. Tatum already had a chance to present new evidence—Dr. Fleming's opinion—and the ALJ discounted it. The ALJ did not do so "simply because it conflicts with *old* information," *McAdams v. Comm'r of Soc. Sec.*, No. 3:21-CV-00203, 2022 WL 17096166, at *3 (S.D. Tex. Nov. 21, 2022) (cited at Dkt. 17 at 12). The ALJ rejected Dr. Fleming's opinion because it was unsupported by record evidence and unpersuasive for additional reasons that Tatum ignores.

In short, Tatum has focused on parts of the ALJ's decision that are unnecessary to a finding that Dr. Fleming's opinion regarding visual acuity (the only opinion relevant to listing 2.02) was unpersuasive. And he does not argue that the ALJ failed to conduct an appropriate persuasiveness analysis under § 404.1520c. The ALJ considered the supportability and consistency of Dr. Fleming's opinion, satisfying the requirements of that provision, and found it lacking. AR 23; *see* 20 C.F.R. § 404.1520c. The ALJ's determination was not "arbitrary[]," *Strickland*, 615 F.2d at 1110, and the court will not second-guess it, *see Boyd*, 239 F.3d at 704; *Harris*, 209 F.3d at 417; *Grennan*, 2022 WL 2056277, at *4. Because Tatum identifies no evidence aside from Dr. Fleming's report that could support an argument under listing 2.02, he is not entitled to a remand on that basis.

## II. HALLEX

"Under . . . binding [Fifth Circuit] precedent, Social Security administrative hearings must follow their own policies." *Morgan v. Colvin*, 803 F.3d 773, 777 (2015) (citing *Newton*, 209 F.3d at 459). "Such hearings are governed by the policies set forth in . . . HALLEX." *Id.* "While other courts have held HALLEX not binding on the Commissioner, the Fifth Circuit utilizes . . . [a] stringent standard." *Id.* (footnote omitted). Specifically, "while HALLEX does not carry the authority of law, . . . 'where the rights of individuals are affected, an agency must follow its own procedures, even where the internal procedures are more rigorous than otherwise would be required,' and '[i]f prejudice results from a violation, the result cannot stand.'" *Id.* (quoting *Newton*, 209 F.3d at 459); *see also Shave v. Apfel*, 238 F.3d 592, 597 (5th Cir. 2001) (noting that the Fifth Circuit requires "a showing that the claimant was prejudiced by the agency's failure to follow a particular rule before such a failure will be permitted to serve as the basis for relief from an ALJ's decision").

A couple of HALLEX provisions in place at the relevant time, *see Fabian v. Berryhill*, 734 F. App'x 239, 243 n.14 (5th Cir. 2018), address the scenario in which an ALJ other than the one who conducted the claimant's hearing needs to issue the decision on the claimant's request for benefits. Under one of those provisions—HA 01210.055(F)(2), the provision on which Tatum bases his argument—a HOCALJ may reassign the case to another ALJ when the ALJ who conducted the hearing is unavailable due to death, retirement, resignation, or a prolonged absence:

> When the HOCALJ or other management ALJ reassigns a case to a different ALJ after a hearing has been held, the ALJ to whom the case is reassigned will review all the evidence of record, including the audio recording of the hearing (see HALLEX HA 01260.040 for more information about hearing recordings).
>
> If the reassigned ALJ intends to issue a fully favorable decision after reviewing the record and audio recording, the ALJ need not conduct another hearing. However, if the ALJ is unable to issue a fully favorable decision based on the information before them, or the ALJ requires more information to make a decision, the ALJ will assess whether another hearing is necessary. The ALJ may find another hearing is necessary if, for example, relevant expert evidence is needed but was not obtained at the hearing, or the ALJ needs additional testimony to fully evaluate a claimant's allegations of pain and other symptoms.

> If the ALJ holds a new hearing, the ALJ will consider all pertinent documentary evidence admitted into the record at the prior hearing, the oral testimony at the prior hearing, and the evidence and testimony adduced at the new hearing when making a decision.

HA 01210.055(F)(2), https://secure.ssa.gov/apps10/poms.nsf/lnx/2501210055.

Under the second provision, HA 01280.040(B),

> [w]hen an ALJ approved a final draft decision but is unavailable to sign the decision, the HOCALJ has the authority to sign the final decision and any associated orders if the ALJ gave the HOCALJ written authorization to sign the decision on the ALJ's behalf. Any such written authorization must be associated with the claim(s) file and must include the following affirmative statements:
>
> • The ALJ has read the decision and any associated order;
>
> • The ALJ concurs with the decision (and any associated order) as written or concurs with the decision (and any associated order) with specified changes previously reviewed and approved by the ALJ before authorization; and
>
> • "HOCALJ [NAME]" is authorized to sign the decision and any associated order on the ALJ's behalf.
>
> The ALJ may give written authorization via email, fax, or any other writing. However, unless the authorization is provided through an official agency email, the ALJ must sign the written authorization with his or her "wet" signature (facsimile transmission is accepted). The ALJ may not use a rubber stamp or other mechanical signature. A HOCALJ may not use this procedure on his or her own initiative without specific written authorization from the ALJ.
>
> If all of the requirements are met, the HOCALJ may sign the decision and any accompanying order.

HA 01280.040(B), https://secure.ssa.gov/apps10/poms.nsf/lnx/2501280040.

Again, Tatum's argument is based on the first of those provisions, HA 01210.055(F)(2). He asserts that the "Commissioner committed [the] same error as in *Morgan*" because "ALJ Ralph Shilling denied benefits without personally hearing [his] testimony based only on a cold hearing transcript that failed to capture the nuances of [his] unique visual limitations," adding that, "although [HA 01210.055(F)(2)] required the ALJ to investigate the need for a new hearing, no such analysis took place." Dkt. 17 at 15; *see id.* at 17 (asserting that it is "clear . . . that the ALJ failed

to conduct the inquiry that § I-2-1-55(F)(2) required"). The court is unconvinced by that argument.

In *Morgan*, the Fifth Circuit reversed an ALJ's decision denying Kenneth Morgan's request for Social Security benefits "[b]ecause the ALJ based his decision on a credibility assessment of Morgan's testimony without holding an additional hearing as required by HALLEX." 803 F.3d at 775. The Court remanded the case to the Commissioner after finding that the HALLEX violation prejudiced Morgan. *Id.* at 777–78.

Like Tatum's final hearing, Morgan's hearing was held before an ALJ other than the one who signed the decision, and "[t]he record [wa]s silent as to why [the first ALJ] was unavailable." *Id.* at 775. The former version of HALLEX that applied in *Morgan* contained language similar to that of HA 01210.055(F)(2). In particular, the court explained that the former provision

> instruct[ed] that the case may be reassigned to a different ALJ, and the ALJ to whom the case is reassigned will review the record and determine whether another hearing is required. The manual gives examples of when such a hearing would be required, including: "[A]nother hearing would be necessary if ... the claimant alleges disabling pain, and the ALJ believes the claimant's credibility and demeanor could be a significant factor in deciding the case."

*Id.* at 777 (quoting HALLEX, § I-2-8-40 (2008)).

The Fifth Circuit explained that Morgan's "credibility was not only a significant factor in deciding his case, it was essential to the [ALJ's] decision." *Id.* (noting the ALJ's express acknowledgement "that 'whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the [ALJ] must make a finding on the credibility of the statements based on a consideration of the entire case record'"). Morgan's "credibility regarding his level of pain ... went directly to whether Morgan could perform any other substantial gainful activity, and this step [step five] was the step upon which the Commissioner denied Morgan's claim" for benefits. *Id.* The court noted that

17

> [a] finding that Morgan's testimony regarding pain was not credible may very well have been supported by substantial evidence—had the ALJ actually heard the testimony. But [the second ALJ] forwent an additional hearing and assumed that an examination of the record was sufficient. Without hearing Morgan's testimony, or having seen Morgan in person, the ALJ violated HALLEX by concluding that Morgan's testimony was not credible.

*Id.* Because "the discrediting of Morgan's testimony by the ALJ prejudiced his claim," remand was required. *Id.* at 778.

Tatum's effort to extend *Morgan* to this case fails. *Morgan* held that, when credibility is central to an ALJ's analysis, a prior version of HALLEX similar to HA 01210.055(F)(2) required a new hearing. The opinion does not speak to a scenario, such as the one presented here, in which an ALJ properly relied on documentary evidence, rather than witness credibility. Nor does it require that an assessment under what is now HA 01210.055(F)(2) be made expressly. *See* Dkt. 17 at 15 (speculating that ALJ Shilling did not conduct an analysis of the purported need for a new hearing because the record does not document any such analysis).

The latter point is not surprising. As noted, the regulations that govern ALJs' assessment of the persuasiveness of medical providers' opinions state that ALJs "will explain" how they considered only the "most important" factors in the persuasiveness analysis, giving ALJs discretion as to whether they say anything at all about how they considered several other factors. 20 C.F.R. § 404.1520c(a), (b)(2). Especially against that regulatory backdrop, it would be surprising for an internal-procedures manual, *see Morgan*, 803 F.3d at 777, to impose an express-explanation requirement implicitly, and Tatum points to no authority in support of his suggestion that it does.

Tatum also offers no reply to several cases the Commissioner cites on this point. In *Cloute v. Barnhart*, for instance, the court concluded that HA 01210.055(F)(2)'s predecessor, which Tatum says imposed essentially the same requirements as the current version of the provision, Dkt. 17 at 16, "suggests that it is aimed primarily at ensuring that the second ALJ has enough evidence upon which to render a decision as opposed to imposing any mandatory requirements on the ALJ" and "vests a substantial amount of discretion with the new ALJ to determine whether or not another

hearing is necessary." No. 03-C-0737-C, 2004 WL 1469374, at *9 (W.D. Wis. June 25, 2004), *report and recommendation adopted*, 2004 WL 1629561 (W.D. Wis. July 19, 2004) (cited at Dkt. 18 at 8–9). That reasoning underscores the point that, notwithstanding the Fifth Circuit's "stringent" approach to HALLEX, *Morgan*, 803 F.3d at 777, Tatum cannot show that the ALJ violated HA 01210.055, which imposes no affirmative duty to explain why another hearing is unnecessary and merely provides guidance on the circumstances in which a new hearing should be conducted.

Tatum also does not explain how the court could properly extend, to the context of HALLEX provisions governing internal operations or processes, the holdings of familiar cases discussing the need for administrative decisionmakers to show their substantive work for the benefit of reviewing courts. *See* Dkt. 17 at 17 (citing, *inter alia*, *SEC v. Chenery Corp.*, 332 U.S. 194, 196–97 (1947); *Newton*, 209 F.3d at 455); *see Schofield v. Saul*, 950 F.3d 315, 321 (5th Cir. 2020). Nor does he explain why ALJ Shilling could not have acted consistently with HALLEX and *Morgan* after reviewing and considering everything that had been presented to ALJ Cichanowicz.

Yet in his first response to Tatum's argument based on HA 01210.055(F)(2), the Commissioner tries to fight speculation with speculation. Referencing HA 01280.040, he tells the court that "this was very likely a matter where the HOCALJ merely signed the unavailable ALJ's completed and final unfavorable draft decision." Dkt. 18 at 6. According to the Commissioner, "[on] the date of the decision and currently, ALJ Ralph F. Shilling was and is the HOCALJ of the Dallas North Hearing Office, the office where [Tatum's] case was handled." *Id.* And the Commissioner tells the court that "HOCALJ Shilling complied with the requirements set forth in the HALLEX by signing the decision 'on behalf of' . . . ALJ Cichanowicz, who had conducted the hearing and likely drafted the decision but was temporarily unavailable to sign it." *Id.* In the Commissioner's view, "had ALJ Shilling been reassigned the case[,]" he would have signed the decision "solely under his own name." *Id.*

The Commissioner next contends that, even if ALJ Shilling was reassigned Tatum's case, Tatum cannot show that ALJ Shilling failed to follow HA 01210.055. He argues that "[Tatum] has

19

not shown that the ALJ was required to state, on the record in the decision, his rationale as to whether a new hearing was necessary." *Id.* at 7. Finally, the Commissioner notes that Tatum "waived his right to a supplemental hearing in a November 8, 2022[,] correspondence." *Id.* at 9.

The court need not embrace either the Commissioner's HA 01280.040-based speculation or his waiver argument because, as already noted, the Commissioner is correct that Tatum has pointed to nothing in HALLEX that required ALJ Shilling to document his assessment of whether a fourth hearing was necessary. And *Morgan*, Tatum's key case on this point, is distinguishable for the reasons stated above.

As with his first issue, Tatum has failed to meet his burden to show an error, much less a harmful one. *See Shinseki v. Sanders*, 556 U.S. 396, 409 (2009). And without an error, Tatum could not have been prejudiced. *See Morgan*, 803 F.3d at 778 (confirming that prejudice must be shown to obtain a remand based on HALLEX error).

In any event, Tatum's prejudice argument fails. Although Tatum bases that argument on what he claims was his "especially unique and complex account of visual limitations," Dkt. 17 at 18, he does not contend that the ALJ needed to assess his credibility to properly rule based on the record evidence, *id.* at 18–20; *see id.* at 19 n.7, Dkt. 19 at 7 (referencing cases that, like *Morgan*, involved credibility determinations but not asserting that the ALJ's decision here turned on such a determination). He also offers no response to the Commissioner's reliance on *Shave*, a case involving an alleged HALLEX violation similar to the one Tatum claims here—but in which claimant Craig Shave did more than Tatum does, "point[ing] out that the ALJ expressly found that his credibility was diminished to the extent not supported by the objective medical evidence" and arguing that the ALJ to whom the case was reassigned after a hearing before another ALJ "had an imperative and unavoidable obligation to hold a second hearing prior to deciding his case." 238 F.3d at 596. In rejecting Shave's argument, the Fifth Circuit explained that

20

[t]he ALJ's limited rejection of Shave's credibility was premised, not upon Shave's demeanor or any other factor that would be better observed in a live hearing, but upon controverting and overwhelming medical evidence to the contrary. Moreover, the ALJ's limited rejection of Shave's credibility was based in part upon the conflict between Shave's hearing testimony and the written record of his own characterization of his condition at the time medical treatment was received. For these reasons, Shave's credibility is not necessarily a "significant" or deciding factor in the decision and a second hearing would not have added in any meaningful way to the administrative record. More importantly, Shave does not offer any theory that would support a contrary conclusion. Therefore, without regard to whether [former] HALLEX I-2-840 would require a second hearing in this case, Shave cannot make the showing of prejudice required to support relief from the ALJ's decision.

*Id.* at 597. So too here.

## CONCLUSION

It is **ORDERED** that the Commissioner's decision is **AFFIRMED**.

So **ORDERED** and **SIGNED** this 23rd day of March, 2026.

Bill Davis
United States Magistrate Judge